# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NORTH DAKOTA

| | | |
|---|---|---|
| Great West Casualty Company, | ) | **ORDER GRANTING PLAINTIFF'S** |
| | ) | **MOTION FOR SUMMARY JUDGMENT** |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| XTO Energy, Inc., Wildcat Trucking, LLC, | ) | |
| Charles Branch, Brian Groover, and | ) | |
| Petroleum Experience, Inc., | ) | Case No. 1:16-cv-387 |
| | ) | |
| Defendants, | ) | |

Before the Court is the Plaintiff Great West Casualty Company's ("Great West") motion for summary judgment filed on July 27, 2017. See Doc. No. 38. The Defendant Wildcat Trucking, LLC ("Wildcat") filed a response in opposition to the motion and a cross-motion for summary judgment on September 14, 2017. See Doc. Nos. 50 and 53. The Defendant Petroleum Experience, Inc. ("Petroleum Experience") filed a response in opposition to the motion on September 14, 2017. See Doc. No. 52. The Defendant XTO Energy, Inc. ("XTO") filed a response in opposition to the motion on September 21, 2017. See Doc. No. 55. Great West filed a reply brief on October 6, 2017. See Doc. No. 58. At the Court's direction, the parties filed supplemental briefs on October 1, 2018. See Doc. Nos. 70, 72, 73, 75. XTO included a motion for attorney's fees in its supplemental brief. See Doc. Nos. 75 and 82. A telephone status conference with the parties was held on December 21, 2018. For the reasons set forth below, Great West's motion for summary judgment is granted. Wildcat's motion for summary judgment and XTO's motion for attorney's fees are denied.

1

**I.     BACKGROUND**

On September 18, 2008, XTO and Wildcat entered into a Master Service Agreement ("MSA") which called for Wildcat to perform work for XTO from time to time and pursuant to job specific work orders, on oil and gas wells owned and operated by XTO. See Doc. No. 41-3. The MSA contained an indemnification clause obligating Wildcat to indemnify and hold harmless the XTO Group, which includes XTO, from all claims and injuries arising out of performance of the agreed upon work. See Doc. No. 41-3, § 10.1. The MSA also required Wildcat to secure and maintain insurance and name the XTO Group as an additional insured. See Doc. No. 41-3, §§ 11.1 and 11.4. Wildcat was insured by Great West. See Doc. No. 41-4. XTO is an additional named insured on the policy Great West issued to Wildcat. See Doc. No. 41-4, p. 46. The MSA qualifies as an "insured contract" under the policy, meaning the policy covers the indemnity obligation Wildcat owes to XTO pursuant to the MSA. See Doc. Nos. 41-4, pp. 64 and 75; 59-1, p. 8.

Great West is a Nebraska corporation based in South Sioux City, Nebraska. XTO is a Texas corporation based in Fort Worth, Texas. Wildcat is a Nebraska corporation based in Sidney, Montana. The Great West policy was issued by Stieg & Associates in Billings, Montana.

On July 18, 2014, Wildcat employees Charles Branch and Brian Groover drove to a oil well located in Williston, North Dakota, which was owned by XTO, in order to deliver fresh water. Both Branch and Groover suffered serious injuries when a flash fire occurred while they were at the well site.

On or about January 27, 2016, Branch commenced a personal injury lawsuit in federal court in North Dakota. See Charles Branch v. XTO Energy, Inc. et al, Case No. 1:16-cv-010, ("Branch Lawsuit"). On or about February 1, 2016, Groover commenced a nearly identical personal injury lawsuit in federal court in North Dakota. See Brian Groover v. XTO Energy, Inc., et al, Case No.

1:16-cv-015, ("Groover Lawsuit").

In both lawsuits it is alleged that on the day of the incident, "XTO was in the process of removing plugs from the well after it had been 'fracked' and recovering fluids and energized gases used in the fracking of the well." See Doc. Nos. 41-1, ¶ 7 and 41-2, ¶ 7. XTO retained various contractors to participate in such activities, including Petroleum Experience, Inc., a consulting company, which provided an employee "to oversee the flow back operation" on behalf of XTO. See Doc. Nos. 41-1, ¶ 8 and 41-2, ¶ 8.

Another contractor, T &R Transport, was hired to "maintain, manage, and perform filtration services necessary to recover flow back water." See Doc. Nos. 41-1, ¶ 10 and 41-2, ¶ 10. In doing so, it used a diesel-powered generator and hydraulic pump. According to the complaints, it is well known that during the filtration project, hydrocarbon vapor clouds can form that are extremely flammable. See Doc. Nos. 41-1, ¶ 11 and 41-2, ¶ 11. It is therefore necessary to set back equipment capable of becoming an ignition source to prevent ignition of the hydrocarbon vapors. The generator and hydraulic pump were ignition sources and allegedly "located near the frac tank from which production water was being pumped" in violation of XTO's safety procedures and industry standards. See Doc. Nos. 41-1, ¶ 13 and 41-2, ¶ 13.

As Branch and Groover were delivering fresh water to the well site, the generator/hydraulic pump unit ignited a hydrocarbon vapor cloud emitting from the frac tanks which resulted in a flash fire. See Doc. Nos. 41-1, ¶ 14 and 41-2, ¶ 14. Branch and Groover suffered burn injuries as a result of the flash fire. The lawsuits generally allege that the defendants were negligent in locating the equipment too close to the frac tanks in violation of XTO's safety guidelines and industry standards and/or in ensuring that such guidelines and standards were followed.

On August 10, 2015, counsel for Branch sent a pre-suit settlement demand to XTO and

Petroleum Experience. On September 2, 2015, XTO tendered the Branch settlement demand to Wildcat and its insurers pursuant to the applicable provisions of the MSA. See Doc. No. 41-5. XTO also claimed that pursuant to the terms of the MSA, it was an additional insured under Wildcat's insurance policies.

On November 9, 2015, James River Insurance Company, on behalf of Petroleum Experience, also tendered the Branch settlement demand to XTO pursuant to a MSA in place between XTO and Petroleum Experience. See Doc. No. 41-6. XTO, in turn, tendered Petroleum Experience's tender to Wildcat and its insurers on November 13, 2015. See Doc. No. 41-7. In its letter, XTO stated that Petroleum Experience was part of the XTO Group and pursuant to the MSA between XTO and Wildcat, Wildcat was required to provide a defense and indemnity to Petroleum Experience, and the XTO Group was an additional insured on Wildcat's insurance policies.

On February 24, 2016, XTO tendered the Groover Lawsuit to Wildcat and its insurers seeking defense and indemnity. See Doc. No. 41-8. In doing so, XTO referenced the MSA between XTO and Wildcat and its status as an additional insured under Wildcat's policies.

On April 18, 2016, Wildcat's insurer, Great West, accepted the tender and provided a defense to XTO in the Branch Lawsuit subject to a full reservation of rights. See Doc. No. 77, pp. 3-14. On November 3, 2016, Great West sent Wildcat and XTO a supplemental reservation of rights letter accepting the tender of both the Branch and Groover lawsuits. See Doc. No. 59-1. In its letter, Great West agreed to provide XTO a defense, subject to a full reservation of rights, and subject to a determination by a court of its coverage obligations. See Doc. No. 59-1, p. 9.

On November 7, 2016, Great West filed this declaratory judgment action in federal court seeking a declaration that the policy it issued to Wildcat contains a hydrofracking exclusion which excludes any coverage for the Branch and Groover lawsuits. See Doc. No. 1. A related coverage

lawsuit was filed by Northfield Insurance Company against XTO and Wildcat in federal court in North Dakota on March 8, 2017. See Northfield Ins. Co. v. XTO Energy, Inc., Case No. 1:17-cv-047.

A global mediation was held in February of 2018. Great West participated in the mediation. The Groover and Branch lawsuits did not settle at the mediation, but discussions continued and settlement agreements were executed in both cases in May of 2018. See Doc. Nos. 73-1. XTO, Wildcat, and Great West all contributed funds to settle the Branch and Groover lawsuits. The *Northfield* coverage action was also settled and dismissed in June of 2018. Great West has declined to dismiss its coverage suit, maintaining it was not a party to the settlement agreements in the Branch and Groover personal injury lawsuits. [1]

## II. STANDARD OF REVIEW

Summary judgment is appropriate when the evidence, viewed in a light most favorable to the non-moving party, indicates that no genuine issues of material fact exist and that the moving party is entitled to judgment as a matter of law. Davison v. City of Minneapolis, Minn., 490 F.3d 648, 654 (8th Cir. 2007); see Fed. R. Civ. P. 56(a). Summary judgment is not appropriate if there are factual disputes that may affect the outcome of the case under the applicable substantive law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). An issue of material fact is genuine if the evidence would allow a reasonable jury to return a verdict for the non-moving party. Id.

---

[1] The Court is uncertain as to why Great West was not a signatory to the releases signed in the two personal injury actions. The record reveals Great West contributed to the global settlement in both cases in the total amount of $87,000. See Doc. Nos. 71 and 78, p. 3. The Great West claims adjuster stated "Our file is now closed" after the global settlement. See Doc. No. 71-1. This case could have been, and should have been, resolved as part of the global settlement. Hopefully, this order will result in the final closure of all remaining disputes.

5

The Court must inquire whether the evidence presents a sufficient disagreement to require the submission of the case to a jury or whether the evidence is so one-sided that one party must prevail as a matter of law. Diesel Mach., Inc. v. B.R. Lee Indus., Inc., 418 F.3d 820, 832 (8th Cir. 2005). The moving party bears the responsibility of informing the court of the basis for the motion and identifying the portions of the record which demonstrate the absence of a genuine issue of material fact. Torgerson v. City of Rochester, 643 F.3d 1031, 1042 (8th Cir. 2011). The non-moving party may not rely merely on allegations or denials in its own pleading; rather, its response must set out specific facts showing a genuine issue for trial. Id.; Fed. R. Civ. P. 56(c)(1). The court must consider the substantive standard of proof when ruling on a motion for summary judgment. Anderson, 477 U.S. at 252.

### III. LEGAL DISCUSSION

#### A. ACTUAL CONTROVERSY

Before the Court addresses the summary judgment motions, it must decide whether an actual controversy remains after the underlying personal injury cases were settled. The Defendants contend Great West participated in and contributed to the settlement and should be bound by the release which accompanied the settlement. In addition, they contend the settlement renders the coverage action moot. Great West argues it did not sign the releases and that it continues to dispute its obligation to defend and indemnify Wildcat.

The Declaratory Judgment Act provides that, "[i]n a case of actual controversy within its jurisdiction . . . any court of the United States . . . may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a). The Declaratory Judgment Act does not extend the jurisdiction of the federal

courts beyond the recognized boundaries of justiciability. Rather, it simply enlarges the range of available remedies. Pub. Water Supply Dist. No. 10 v. City of Peculiar, Mo., 345 F.3d 570, 572 (8th Cir. 2003). "The controversy requirement of the Declaratory Judgment Act is synonymous with that of Article III of the Constitution." Carson v. Pierce, 719 F.2d 931, 933 (8th Cir.1983) (citing Aetna Life Ins. Co. v. Haworth, 300 U.S. 227, 239-40 (1937) (finding federal court jurisdiction is limited to justiciable cases by Article III's case and controversy requirement).

The Court concludes an actual controversy exists in this case. The use of a declaratory judgment action in insurance cases is quite common. See 10B Wright, Miller, & Kane, Federal Practice and Procedure § 2760 (3d ed. 1998). An insurer who is not a party to the underlying proceeding is entitled to have the extent of the coverage obligations declared in a declaratory judgment action. Med. Liab. Mut. Ins. Co. v. Alan Curtis LLC, 519 F.3d 466, 471 (8th Cir. 2008). "In the insurance policy coverage context, a declaratory judgment action is ripe irrespective of whether the underlying litigation is ongoing or resolved." Scottsdale Ins. Co. v. Universal Crop Prot. All., LLC, 620 F.3d 926, 934 (8th Cir. 2010). The controversy is not mooted by the settlement. In addition, Great West was not a party to the settlement and did not sign the releases. While the Defendants may have wanted and expected Great West to dismiss its coverage action, Great West was not obligated to do so and is entitled to a decision on the issues it raises.

### B. CHOICE OF LAW

Before the Court can analyze the insurance policy, it must decide what state law applies. The parties have not specifically addressed the issue. XTO suggested in a footnote that Montana law most likely applies. See Doc. No. 55, p. 9. Most of the law the parties cite is from North Dakota. The policy does not contain a choice of law provision.

In a diversity case, the federal court must apply the choice of law rules "of the forum state to determine which state's law is to be applied." Nat'l Farmers Union Prop. & Cas. Co. v. Dairyland Ins. Co., 485 F. Supp. 1009, 1010 (D.N.D. 1980) (citing Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496 (1941)). North Dakota is the forum state in this case. North Dakota utilizes a two-pronged approach to determine which state law should apply. Schleuter v. N. Plains Ins. Co., 772 N.W.2d 879, 885 (N.D. 2009) (citing Nodak Mut. Ins. Co. v. Wamsley, 687 N.W.2d 226, 231 (N.D. 2004)). First, the court identifies the "relevant contacts which might logically influence the decision of which law to apply." Daley v. Am. States Preferred Ins. Co., 587 N.W.2d 159, 161 (N.D. 1998) (citing Issendorf v. Olson, 194 N.W.2d 750, 755 (N.D. 1972)). Second, the court applies the five choice-influencing "*Leflar* factors" to determine which state has the more significant interest in the outcome of the litigation. Id. at 162. The five *Leflar* factors are: (1) predictability of results; (2) maintenance of interstate and international order; (3) simplification of the judicial task; (4) advancement of the forum's governmental interests; and (5) application of the better rule of law. Id.

In this case, the insurance contract between Great West and Wildcat was entered into in Montana. Great West is a Nebraska corporation. Wildcat is a Montana corporation. XTO, which is an additional named insured under the policy, is a Texas corporation. The insurance policy was issued by a Montana insurance agency. The accident occurred at an oil and gas well located in North Dakota. Branch is a resident of Illinois. Groover is a resident of Georgia. The insurance policy makes repeated reference to Montana law without any mention of other state specific law. See Doc. No. 41-4, pp. 33, 60, 87, 102, and 112. The policy does not contain a choice of law provision. The most significant contacts related to the insurance contract are clearly that of Montana. North Dakota's contacts only relate to the personal injury claims which have been settled.

8

As for the *Leflar* factors, they also support the application of Montana law. Predictability of result favors application of the law of the state where the policy was negotiated and issued. Wamsley, 687 N.W.2d at 232 (finding North Dakota law should apply to a dispute between a North Dakota insurer and a North Dakota insured where the accident happened in Montana). Maintenance of interstate order is not an issue and the Court will have no difficulty applying the law of either state. Montana has a greater interest in regulating the relationship between a Nebraska insurance company and a Montana insured than does North Dakota. Id. at 234. Courts rarely give consideration to which state has "the better rule of law" as sometimes different laws are just different. Id. The Court concludes based on the facts of this case, that Montana has more significant contacts and interests in the insurance contract at issue than North Dakota. Thus, the Court will apply Montana law.

### C. HYDROFRACKING EXCLUSION

Great West contends coverage is precluded by the policy's hydrofracking exclusion. The Defendants maintain the hydrofracking exclusion is ambiguous and if given effect would render coverage under the policy illusory.

In Montana, the interpretation of an insurance contract is a question of law. Cusenbary v. U.S. Fid. & Guar. Co., 37 P.3d 67, 68 (Mont. 2001). When construing the terms of an insurance policy the court must look first to the plain language of the policy. Monroe v. Cogswell Agency, 234 P.3d 79, 82 (Mont. 2010). "The terms and words used in an insurance contract are to be given their usual meaning and construed using common sense." Hardy v. Progressive Specialty Ins. Co., 67 P.3d 892, 896 (Mont. 2003). A court must not rewrite an insurance contract "but must enforce it as it is written if its language is clear and explicit." Monroe, 234 P.3d at 83.

"Any ambiguity in an insurance policy must be construed in favor of the insured and in favor of extending coverage." Hardy, 67 P.3d at 896. A policy provision is ambiguous if it is susceptible to more than one reasonable interpretation. Giacometti v. Scottsdale Ins. Co., 221 P.3d 666, 672 (Mont. 2009). Whether a contract provision is ambiguous is a question of law, "which courts resolve from the viewpoint of the layperson untrained in the law or the insurance business." Id. (internal quotations omitted). Ambiguity does not exist simply because the parties disagree as to the meaning of a policy provision. Id. "Courts will not distort contractual language to create ambiguity where none exists." Id.

An insurer's duty to defend arises when a complaint against an insured alleges facts, which if proven, would result in coverage. J & C Moodie Props., LLC v. Deck, 384 P.3d 466, 472 (Mont. 2016). The duty to defend exists "unless there exists an unequivocal demonstration that the claim against an insured does not fall within the insurance policy's coverage" Id. The duty to defend is independent of and broader than the duty to indemnify. Id. "If an insurer believes a policy exclusion applies, the prudent course of action is to defend under a reservation of rights and file a declaratory action to resolve the coverage question." Id.

1. **AMBIGUITY**

At the time of the incident, Wildcat was the named insured on the policy issued by Great West. See Doc. No. 41-4. The policy affords liability coverage pursuant to a Commercial Auto Coverage Part, the relevant portion of which provides as follows:

A. **COVERAGE**

> We will pay all sums an "insured" legally must pay as damages because of "bodily injury" or "property damage" to which this insurance applies, caused by an "accident" and resulting from the ownership, maintenance or use of a

10

covered "auto."

* * * *

> We have the right and duty to defend any "insured" against a "suit" asking for such damages . . . However, we have no duty to defend any "insured" against a "suit' seeking damages for "bodily injury" or "property damage" . . . to which this insurance does not apply . . . .

See Doc. No. 41-4, p. 62.

Coverage under the policy is subject to various exclusions. One of those exclusions is the hydrofracking exclusion endorsement, the relevant portion of which provides as follows:

> **A.** The following is added to Commercial Auto Coverage Part - Section II - Liability Coverage - Exclusions:
>
> This insurance does not apply to any of the following:
>
> 1. "Bodily injury", "property damage" or "covered pollution cost or expense" arising, in whole or in part, out of "hydrofracking" or the storage or disposal of any "flowback", by any "insured" or by any other person or entity.
>
> 2. Payment for the investigation or defense of any "loss", injury or damage or any cost, fine or penalty or for any expense of claim or "suit" related to any of the above.

* * * *

> **C. ADDITIONAL DEFINITIONS**
>
> As used in this endorsement:
>
> 1. "Hydrofracking" or hydraulic fracturing means the process by which water, proppants and/or chemicals are injected at high pressure into underground geologic formations to create fractures, to facilitate the extraction of natural gas and/or oil.
>
> 2. "Flowback" or produced water means any wastewater containing returned "hydrofracking" fluid, including but not limited to water, proppants, "hydrofracking" fluid additives; and, any hydrocarbon compounds, salts, conventional pollutants, organics, metals, and naturally occurring radioactive material brought to the surface with

11

the wastewater.

See Doc. No. 41-4, p. 109.

The Defendants contend the use of the phrase "arising, in whole or in part, out of" in the hydrofracking exclusion renders the exclusion ambiguous under Montana law citing *Pablo v. Moore*, 995 P.2d 460, 464 (Mont. 2000) and *Troutt v. Colo. W. Ins. Co.*, 246 F.3d 1150 (9th Cir. 2001). The Defendants ask that the phrase be construed in their favor but do not offer an alternate interpretation. The genesis of *Pablo* and *Troutt* is the Montana Supreme Court's opinion in *Wendell v. State Farm Mut. Auto. Ins. Co.*, 974 P.2d 623 (Mont. 1999).

In *Wendell*, the Montana Supreme Court found, in the context of uninsured motorist ("UM") coverage, the phrase "arising out of the use" was ambiguous because it was reasonably subject to more than one interpretation. Wendell, 974 P.2d 638-39. The insured argued it meant the injury originated from or grew out of or flowed from the use of an uninsured vehicle. Id. at 637. The insurer argued the phrase covered injuries that result as a natural consequence from the use of an insured vehicle. Id. The Court adopted the broader more fact intensive test suggested by the insured and held "for the purposes of UM coverage, an insured's injuries 'arise out of the use' of an uninsured vehicle if the injuries originate from, or grow out of, or flow from the use of the uninsured vehicle." Id. at 639. The case was remanded to the district court for a factual determination of whether the injuries originated from, grew out of, or flowed from the use of the vehicle. Id. at 639.

In *Pablo*, the Montana Supreme Court extended *Wendell* to the phrase "arising out of" as used in an auto exclusion in a commercial general liability policy and found it to be ambiguous as it was reasonably subject to more than one interpretation. Pablo, 995 P.2d at 462-63. The court narrowly construed the exclusion in favor of the insured. Id. at 464. The court held that claims of negligent hiring, training, and supervision were not clearly and unambiguously excluded from

coverage under the policy. Id.

In *Troutt*, the Ninth Circuit Court of Appeals, relying on *Pablo*, found "arising out of" as used in a liquor liability policy ambiguous. Troutt, 246 F.3d at 1160. The Ninth Circuit adopted the insured's construction of the phrase "arising out of" and held it meant "having a connection with." Id. In doing so the Ninth Circuit noted the construction was plausible, had been adopted in other contexts, and was supported by Montana case law. Id.

In *American Economy Ins. Co. v. Aspen Way Enterprises, Inc.*, 2015 WL 12748304 (D. Mont. Sept. 25, 2015), consumers brought suit against a rent-to-own store alleging violations of the Electronic Communications Privacy Act related to software installed on leased computers which allowed the store to secretly monitor activity on the computer. The store's insurers brought a declaratory judgment action in federal court asking for a declaration that they had no duty to defend the store citing, among other things, a Recording and Distribution Exclusion" which excluded coverage for "[p]ersonal and advertising injury <u>arising directly or indirectly out of</u> any action or omission that violates or is alleged to violate" the law. Id. at *3 (internal quotation makes omitted and emphasis added). The store argued that the exclusion was ambiguous under Montana law due to its use of the phrase "arising directly or indirectly out of." However, the court, while acknowledging the precedent set by *Wendell* and *Pablo*, noted an ambiguous policy term did not invalidate an exclusion and the store had not offered an alternate interpretation. Id. at *6. The court stated it could not imagine a reasonable construction of the phrase "arising directly or indirectly out of" which would not preclude coverage and found for the insurers. Id. at *6-7.

In <u>City of Dillon v. Mont. Mun. Ins. Auth.</u>, 220 P.3d 623 (Mont. 2009) a widow sued the City of Dillon for unpaid pension benefits related to her late husband's service as a police officer. The Montana Municipal Insurance Authority ("MMIA") denied coverage to the City of Dillon citing

a financial gain exclusion which excluded coverage for liability "arising in whole or in part out of" the covered party obtaining financial gain to which it was not legally entitled. Id. at 624. After losing the underlying case, the City of Dillon sued the MMIA to recover the judgment and defense costs. The Montana Supreme Court, without any mention of *Wendell* and *Pablo*, found the language of the exclusion to be unambiguous, applied the plain language of the exclusion, and determined MMIA was not obligated to provide coverage. Id. at 625-26.

*Wendell* and *Pablo* did not involve a hydrofracking exclusion or the much more broad "in whole or in part" language. Nor do *Wendell* and *Pablo* require the Court to adopt a strained application of an exclusion. The Court finds the language of the hydrofracking exclusion at issue in this case to be unambiguous based on the Montana Supreme Court's opinion in *City of Dillon* which interpreted the exact same operative language. As the Court finds no ambiguity, it will apply the plain language of the statute.

The complaints filed by Branch and Groover are nearly identical. See Doc. Nos. 41-1 and 41-2. They both alleged that at the time of the incident "XTO was in the process of removing plugs from the well after it had been <u>fracked</u> and recovering <u>fluids and energized gases</u> used in the <u>fracking</u> of the well." See Doc. No. 41-1, ¶ 7 (emphasis added). An employee of Petroleum Experience was on site to "oversee the <u>flow back</u> operation." See Doc. No. 41-1, ¶ 8 (emphasis added). "T &R Transport was retained to "perform filtration services necessary to recover <u>flow back</u> water" which involved the use of "a diesel-powered generator and hydraulic pump." See Doc. No. 41-1, ¶ 10 (emphasis added). In filtration projects of this kind, "<u>hydrocarbon vapor clouds</u> can form that are extremely flammable." See Doc. No. 41-1, ¶ 11 (emphasis added). "Because of the flammability of the <u>hydrocarbon vapor clouds</u>, certain setbacks of equipment capable of becoming an ignition source are necessary to prevent ignition of the <u>hydrocarbon vapors</u>." See Doc. No. 41-1,

14

¶ 12 (emphasis added). The generator and pump "were located near the frac tank from which production water was being pumped. See Doc. No. 41-1, ¶ 13 (emphasis added). As Groover and Branch were delivering fresh water to the well site, "the generator/pumping unit ignited a hydrocarbon vapor cloud emitting from the frac tanks which resulted in a flash fire" which seriously burned them. See Doc. No. 41-1, ¶ 14 (emphasis added).

The hydrocfracking exclusion applies to injuries "arising, in whole or in part, out of 'hydrofracking' or the storage or disposal of any 'flowback.'" See Doc. No. 41-4, p. 109. As the policy definitions of hydrocfracking and flowback explain, hydrofracking is the process of fracking a well while flow back, which is often referred to as produced water or waste water, is one of the byproducts of the process. The exclusion covers the storage and disposal of the flowback. Any reasonable review of the complaint reveals Groover and Branch were injured when the flow back from a fracked well overflowed a frac tank, where it was being stored and from which flow back was being pumped, and exploded. The complaint describes a flow back operation, the removing of plugs from a well after it had been fracked, and the filtering and recovering of fluids and energized gases used in the fracking of the well. The exclusion clearly covers injuries arising from or caused "in whole or in part" by hydrofracking or by the "storage or disposal" of flowback.

The Defendants offer an unreasonably narrow construction of "arising, in whole or in part, out of hydrofracking or the storage or disposal of any flowback" such that the "in whole or in part" language is read out of the exclusion. The Defendants contend the injuries could not have arisen out of the process of hydrofracking because the injuries occurred after the well had been fracked, thus suggesting that "arising, in whole or in part, out of" only refers to incidents "that occur during" the process of hydrofracking or the storage or disposal of flowback See Doc. No. 55, ¶ 40. The Defendants further contend the allegations in the underlying complaints do not relate to the "storage

or disposal of any flowback." The Defendants offer no case law interpreting a hydrofracking exclusion to support their argument. The Court finds these interpretations unreasonable. The "arising in whole or in part" language from the exclusion is very broad. The Defendants' contention would impermissibly read the "in whole or in part" language out of the exclusion. The activities which resulted in the injuries to Branch and Groover were clearly related, at least in part, to hydrofracking and the storage or disposal of flowback. Recovering flowback, filtering, storing, and disposing of it after a well that has been fracked, is an essential part of the hydrofracking process. This is exactly what was going on when the explosion occurred which injured Groover and Branch.

Based upon the plain language of the policy, the Court finds the hydrofracking exclusion squarely applies to injuries arising out of the activities described in the Branch and Groover complaints. The strained reading of the exclusion offered by the Defendants is unpersuasive. Hydrofracking and the storage and disposal of flow back was at least in part, if not almost entirely, responsible for the injuries to Groover and Branch. That the flow back was also being filtered does not alter the conclusion.

### 2. ILLUSORY COVERAGE

In Montana, insurance coverage is illusory if it provides effectively non-existent coverage for the premium paid. See Monroe, 234 P.3d at 83 (finding coverage "far from being illusory" where exclusion made coverage available only in limited circumstances); see also Lorenz v. Nat'l Union Ins. Co. of Pittsburgh, 2014 WL 12544880, *3 (D. Mont. April 4, 2014) (explaining that under Montana law an insurance policy is illusory if it provides effectively non-existent coverage for the premium paid, but noting that a denial of coverage due to valid exclusions does not make a policy illusory as "all policy exclusions operate to deny coverage in some way"); Forsman v. United

16

Financial Cas. Co., 966 F. Supp. 2d 1091, 1105 (D. Mont. 2013) (explaining that the fact plaintiffs could point to a situation in which coverage may be excluded did not mean the policy's collision coverage as a whole was illusory; there were a number of situations in which insureds can recover under the collision coverage).

By its own admission, Wildcat "is a trucking contractor providing services, including hauling water, to oilfield operators in the Bakken, and at times would be in proximity to hydraulic fracturing operations." See Doc. No. 50, p. 7. The policy is for commercial vehicle coverage. The list of scheduled vehicles is lengthy. Wildcat admits it provides a variety of services and there can be no reasonable dispute that commercial coverage is available for other operations that do not have any relation to hydrofracking. Wildcat obtained and paid premiums for commercial auto coverage on its trucking business. The policy contains a number of exclusions, but the plain language of the policy clearly covers a myriad of other scenarios. For instance, if the vehicle Branch and Groover were operating had been involved in an accident while traveling a public roadway while hauling water from place to place, coverage would clearly be available. The coverage was not illusory.

Having determined that the hydrofracking exclusion applies, the Court need not address the issues related to who is an additional insured and the insured contract provision.

IV. **CONCLUSION**

For the reasons set forth above, the Plaintiff's motion for summary judgment (Doc. No. 38) is **GRANTED**. Wildcat's cross-motion for summary judgment (Doc. No. 53) is **DENIED**. XTO's motion for attorney's fees (Doc. No. 82) is **DENIED**. The Court finds and declares that the hydrofracking exclusion in the policy excludes coverage for the claims brought by Branch and

Groover and, therefore, Great West is not obligated to provide coverage to Wildcat, XTO, or Petroleum Experience related to those incidents.

**IT IS SO ORDERED**.

Dated this 3rd day of January, 2019.

*/s/ Daniel L. Hovland*
Daniel L. Hovland, Chief Judge
United States District Court